UNITED STATES ᴇᴛ ᴀʟ. *v.* N. E. ROSENBLUM
TRUCK LINES, INC.*

No. 52.   Argued December 16, 17, 1941.—Decided January 19, 1942.

*Mr. Frank Coleman,* with whom *Solicitor General Biddle, Assistant Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. James C. Wilson, Daniel W. Knowlton, Nelson Thomas,* and *Harry C. Blanton* were on the brief, for appellants.

---

*Together with No. 53, *United States et al.* v. *Margolies, doing business as Manhattan Truck Lines,* also on appeal from the District Court of the United States for the Eastern District of Missouri.

*Mr. Gus O. Nations,* with whom *Mr. M. E. Aronoff* was on the brief, for appellees.

MR. JUSTICE MURPHY delivered the opinion of the Court.

These are direct appeals by the United States and the Interstate Commerce Commission from final decrees of a specially constituted three-judge district court,[1] which sustained appellees' separate petitions to annul, set aside and enjoin an order of the Commission entered July 1, 1940, denying appellees' separate applications under the so-called "grandfather clause" of § 209 (a) of the Motor Carrier Act of 1935 [2] (49 Stat. 543, 552, 49 U. S. C. § 309 (a)), for a permit authorizing operations as a contract carrier by motor vehicle.

The evidentiary facts are not seriously disputed. Prior to the critical date, July 1, 1935, and until February 1936, appellees and their predecessors in interest [3] hauled only for common carriers by motor vehicle, and in each case principally for a single common carrier, between St. Louis and Chicago, for which they were paid a lump sum on dock to dock movements. Appellees protected their equipment by carrying fire, theft and collision insurance in their own names. They also paid the operating and maintenance costs. Cargo, public-liability, property-damage, and similar types of insurance for the protection

---

[1] Convened pursuant to the Urgent Deficiencies Act of 1913 (38 Stat. 220, 28 U. S. C. §§ 47 and 47 (a)) and § 205 (h) of the Motor Carrier Act of 1935, rearranged by the Transportation Act of 1940, 54 Stat. 899, as § 205 (g) of Part II of the Interstate Commerce Act.

[2] The Motor Carrier Act of 1935 is now designated as Part II of the Interstate Commerce Act. 54 Stat. 919.

[3] In both of these cases it was the appellee's predecessor in interest who was operating on July 1, 1935. The predecessor of appellee in No. 52 was Rosenblum the individual, and the predecessor of appellee in No. 53 was an individual, Baulos.

of the general and the shipping public, were taken out by the common carriers and in some instances charged to the appellees. They occasionally paid small cargo damage claims not covered by insurance. The drivers of appellees' trucks were their employees. The specificity with which the common carriers directed the routes to be followed is in some doubt, but the drivers were requested to "sign in" at certain registration stations en route.

The greater portion of the traffic of the common carriers which appellees served was carried in the carriers' own vehicles. Appellees' equipment was secured on oral arrangements to handle overflow freight. The freight so handled was always solicited by the common carrier, accumulated at its terminal, loaded and unloaded by its employees, and moved from consignor to consignee on that carrier's way bills. The record is silent as to whether appellees' trucks bore the name of the common carrier on whose behalf they were operated.

After February 1936 appellees ceased hauling for common carriers by motor vehicle and began hauling for individual shippers in their own right.

The Commission found that appellees' equipment prior to February 1936 "was operated solely under the direction and control of the common carriers and under the latter's responsibility to the general public and to the shippers" and concluded that "as to such operations applicants [appellees] do not qualify as carriers by motor vehicle within the meaning of the Act and are consequently not entitled to a certificate or a permit under the 'grandfather' clause of Section 206 (a) or 209 (a) thereof." [4]

The court below set aside the Commission's order, concluding that appellees were in "bona fide operation as [a] contract carrier[s] in interstate commerce on July 1, 1935" and "in so operating assumed control, management

---

[4] 24 M. C. C. 121, 125–126.

and responsibility for the hauling of cargo" and that "there is no substantial evidence in the record to support the order entered." [5]

The point of divergence between the Commission and the court below seems to have been whether the evidentiary facts supported the Commission's ultimate conclusion that appellees operated solely under the control of the common carriers. Because of our views as to the proper construction of the Act, we need not determine whether substantial evidence supports that conclusion of the Commission. In any event the evidence clearly shows that on the critical date, and from then until February 1936, appellees helped the common carriers move their overflow freight and, as to each job, were an integral part of a single common carrier service offered to the public by the common carrier for whom they hauled.

The question here, as in any problem of statutory construction, is the intention of the enacting body. Congress has set that forth for us broadly in the declaration of policy [6]— in essence it is the regulation of transportation by motor carriers in the public interest so as to achieve adequate, efficient and economical service. To implement that policy Congress forbade common carriers by motor vehicle to operate in interstate commerce without securing a certificate of public convenience and necessity from the Commission,[7] and required contract carriers to secure a permit from that body.[8] Those carriers engaged in either of such operations on the respective critical dates and continuously thereafter were to be given the requisite certificate or permit as of right under the "grandfather" provisos of §§ 206 (a) and 209 (a). We think it clear that Congress did not intend to grant

[5] 36 F. Supp. 467.

[6] § 202 (a), 49 U. S. C. § 302 (a).

[7] § 206 (a), 49 U. S. C. § 306 (a).

[8] § 209 (a), 49 U. S. C. § 309 (a).

54

multiple "grandfather" rights on the basis of a single transportation service. Presumably the common carriers which appellees served were entitled to common carrier "grandfather" rights over the entire line. It was the common carriers who offered the complete transportation service to the general public and the shipper. To hold that appellees, who performed part of that complete transportation service for those common carriers under agreements with them, acquired contract carrier "grandfather" rights over the same line entitling them also to serve the public is to ascribe to Congress an intent incompatible with its purpose of regulation. The result would be to create in this case two services offering transportation to the public when there had been only one on the "grandfather" date, without allowing the Commission to determine if the additional service was in the public interest. And, instances can readily be imagined where a single common carrier might utilize the services of several operators such as appellees. Automatically to grant contract carrier rights to such operators might result in such a wholesale distribution of permits as would defeat the very purpose of federal regulation.

Also indicative of the Congressional intent not to confer contract carrier "grandfather" rights on operators, such as appellees, who, on the critical date, were not serving the public directly but were instruments performing part of a common carrier service, is the fact that there would seem to be no reason to apply to them the regulatory provisions of the Act generally applicable to contract carriers, such as the requirement that they should secure a permit only after a showing that their operations are "consistent with the public interest" (§ 209 (b)), or that they should file schedules of their minimum rates (§ 218 (a)), or that the Commission should prescribe the minimum rates (§ 218 (b)). The Act clearly contemplates that contract and common carriers will offer com-

peting types of service, for § 210 prohibits any person from simultaneously holding a certificate and a permit for the same route or territory unless the Commission finds that such is in the public interest, and § 218 (b) enjoins the Commission, in prescribing minimum rates for contract carriers, to "give no advantage or preference to any such carrier in competition with any common carrier by motor vehicle subject to this part." The declaration of policy in § 202 (a) which stresses the avoidance of destructive and unfair competition is referred to in the sections dealing with contract carriers.[9]

Appellees' contention that their activities on the critical date fall within the literal language of the definition of "contract carrier" in force on the date of the order [10] and that they are therefore entitled to contract carrier "grandfather" rights is without merit. A holding that the activities of appellees prior to February 1936 were those of contract carriers would not accord with the intent of Congress. Where the plain meaning of words used in a statute produces an unreasonable result, "plainly at variance with the policy of the legislation as a whole," we may follow the purpose of the statute rather than the literal words. *United States* v. *American Trucking Associa-*

[9] § 209 (b), 49 U. S. C. § 309 (b). § 218 (b), 49 U. S. C. § 318 (b).

The Commission has taken the position that while there may be destructive or unfair competition with common carriers when truck operators contract to do work in connection with transportation for common carriers which serve shippers directly, "it is not the truck operator who carries it on. Rather it is the carrier for which he works, . . ." Scott Bros. Inc., 4 M. C. C. 551, 559.

[10] § 203 (a) (15). The term "contract carrier by motor vehicle" means any person, not included under paragraph (14) of this section, who or which, under special and individual contracts or agreements, and whether directly or by a lease or any other arrangement, transports passengers or property in interstate or foreign commerce by motor vehicle for compensation. (The Transportation Act of 1940, 54 Stat. 899, amended this definition.)

*tions,* 310 U. S. 534, 543, and cases cited. We conclude that the Commission rightly determined that appellees were not contract carriers within the meaning of the Act prior to February 1936.

Appellees make no contention that they were common carriers during the period in question, and we are clear that they were not, for the Congressional intent to avoid multiple "grandfather" rights on the basis of a single transportation service is equally applicable to prevent appellees from being considered either as contract or as common carriers within the meaning of the Act. The reasonableness of this interpretation of the Act is apparent. Since appellees' operations, namely, serving the common carriers, on the critical date did not make them "carriers" within the meaning of the Act, and thus subject to regulation under it, it follows that they are free to engage in such operations without securing the authorization of the Commission.[11] But those operations cannot be the basis for appellees' automatically securing permits to serve the public in their own right, a service which they were not performing on the "grandfather" date.

The fact that carriers within the meaning of the Act need not deal directly with the public but may act through brokers[12] in no wise affects our conclusion. As we have seen, Congress did not intend to confer multiple "grandfather" rights on the basis of a single transportation service to the public. That difficulty arises only when an operator undertakes to serve a carrier who is serving the

[11] The Commission has so held. Dixon, 21 M. C. C. 617; Smythe, 22 M. C. C. 726.

[12] Section 203 (18), 49 U. S. C. § 303 (18), defines "broker" substantially as one who sells or offers for sale any transportation. Section 211 (a), 49 U. S. C. § 311 (a), requires that brokers be licensed and that the carriers they employ have either a certificate or a permit issued under the Act.

public.  It is not present when a carrier deals through a broker.

*Reversed.*

Mr. Justice Roberts took no part in the consideration or decision of these cases.